IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MELISSA CANATA, )
)
Plaintiff, )
) No. 09 C 5649
vs. ) Magistrate Judge Sidney I. Schenkier
)
MICHAEL ASTRUE, Commissioner )
of Social Security, )
)
Defendant. )

**MEMORANDUM OPINION AND ORDER**[1]

Melissa Canata seeks an order reversing or remanding the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for social security benefits, namely social security income ("SSI") and disability insurance benefits ("DIB"), pursuant to 42 U.S.C. § 405(g) and (h) (doc. # 34). The Commissioner has filed a response (doc. #35), seeking to affirm the denial of benefits.[2] For the reasons set forth below, the Court remands this case to the Commissioner to determine whether the Administrative Law Judge ("ALJ") erred at Step Three of the sequential evaluation, 20 C.F.R. § 404.1520(a)(4). Ms. Canata's motion to remand (doc. #34) is therefore granted, and the Commissioner's motion to affirm (doc. # 35) is denied.

---

[1]On April 21, 2010, by order of the Executive Committee and pursuant to the parties' consent and 28 U.S.C. § 636(c), this case was transferred to this Court for all proceedings, including entry of final judgment (doc. # 19).

[2]Under the briefing schedule set by the Court (doc. # 33), plaintiff was allowed an opportunity to file a reply memorandum by August 15, 2011. When plaintiff failed to file a reply or a motion for extension of time by that date, on August 25, 2011, the Court *sua sponte* gave plaintiff until September 2, 2011 to file a reply (doc. #36). Again, plaintiff failed to do so. Accordingly, we treat the briefing as closed.

# I.

Ms. Canata was born on February 28, 1976. She was 28 years old when she filed an application for DIB and SSI with the Commissioner on January 25, 2006 (R. 138-44),[3] alleging a disability onset date of February 17, 2005 (R. 138), due to spinal disorder, depression, and anxiety (R. 27, 28). Based on her employment history, Ms. Canata's date of last insured status was December 31, 2008.

In February 2005, Ms. Canata was employed as a Certified Nursing Assistant ("CNA") by Alexian Brothers Medical Center ("Alexian Brothers") (R. 109, 160), where she had been working for approximately one year. Prior to this job, Ms. Canata was employed as a CNA by Glenbard Homecare Inc. for three months and Central DuPage Hospital Association for eleven months. Ms. Canata stopped working for Alexian Brothers in February 2005, because she could not tolerate the regular, full-time heavy duty work, and Ms. Canata has not worked since that time (R. 152, 399). Ms. Canata testified that she attempted to return to work in June 2005, but she worked for only a few hours because she was unable to handle the job (R. 399). The record indicates that Ms. Canata has not been able to engage in physical therapy, as prescribed, due to workers' compensation insurance issues related to her back injury (R. 297, 300).

Ms. Canata has a General Education Degree ("GED") and has taken several college courses. She is divorced and has two daughters from this marriage. The oldest daughter, who was 14 years old at the time of the administrative hearing, has bi-polar disease and lives with her mother full-time in a two-bedroom apartment (R. 176, 184, 202, 395). The youngest daughter, who was 8 years old

---

[3] There is no application for Social Security Income ("SSI") in the record; consequently, we cannot consider Ms. Canata's request for such benefits on appeal (Pl.'s Mem. at 2).

at the time of the hearing, lives half-time with her father (R. 176). Ms. Canata's older daughter receives social security income based on her disability (R. 396). It appears from the record that this is the only source of income for Ms. Canata and her daughter.

Ms. Canata's claims were initially denied on June 16, 2006, and a motion to reconsider was denied on September 13, 2007 (R. 24). Ms. Canata then filed a request for an administrative hearing, which initially was denied by an ALJ as untimely (R. 24-25). Ms. Canata appealed the Order of Dismissal and, on September 15, 2008, the Appeals Council remanded the case to the ALJ with directions to give Ms. Canata an administrative hearing (R. 67). The Appeals Council found good cause for Ms. Canata to have been late in seeking a hearing: she was "not represented and has a history of anxiety and depression" (R. 67), and "[t]he treating source assessed a GAF of 45/50 suggesting serious mental symptoms and evidence" which indicated "that the claimant was unstable during her interview at the field office" (*Id.*).[4]

## II.

At the administrative hearing, held on January 15, 2009, Ms. Canata testified on her own behalf. She was not represented by an attorney at this hearing. The ALJ arranged for a Vocational Expert ("VE"), as well as a Medical Expert ("ME") with a Ph.D. in psychiatry, Dr. Kathleen O'Brien, to review the medical evidence and testify at the hearing. On February 3, 2009, the ALJ issued a written opinion denying Ms. Canata benefits (R. 15-23). The ALJ applied the required five-step analysis set forth in the Social Security regulations. 20 C.F.R. § 404.1520(a)(4). These steps

---

[4]The record before this Court does not contain evidence of a low GAF score, and the ALJ does not rely on one in making any disability determination. Nor does plaintiff make any argument based on this GAF score, which is at a level that indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Jelinek v. Astrue*, No. 10-3340, 2011 WL 5319852, at *1 n.1 (7th Cir. Nov. 7, 2011).

3

are evaluated sequentially, and require the ALJ to determine whether: (1) the claimant is currently performing any "substantial gainful activity;" (2) the claimant's alleged impairment or combination of impairments is severe; (3) any of the claimant's impairments meet or medically equal any impairment listed in Appendix 1 of the regulations ("Listing"); (4) the claimant is unable to perform her past relevant work based on her residual functional capacity ("RFC"); and (5) the claimant's RFC renders her unable to perform any other work in the national economy. *Id.; Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The claimant has the burden of proof in Steps 1 through 4. *Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1059 (N.D. Ill. 2004). At Step 5, the burden of proof shifts to the Commissioner (*Id.*).

At Step 1, the ALJ found that Ms. Canata had not engaged in substantial gainful activity since February 17, 2005, the alleged onset date (R. 16). At Step 2, the ALJ found that Ms. Canata has severe impairments of spinal disorder, depression, and anxiety (*Id.*). However, at Step 3, the ALJ found that Ms. Canata's severe impairments do not meet or medically equal any Listing (R. 17).

The ALJ then found that Ms. Canata has an RFC that allows her to perform unskilled light work, as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), so long as it does not require: (1) climbing ropes or scaffolds, or exposure to vibrations; (2) more than occasional stooping, kneeling, crouching or crawling or climbing of stairs or ropes; (3) more than minimal interaction with co-workers or supervisors; (4) interaction with the public; and (5) production line work which demands more than normal production quotas (R. 17-20). The ALJ found at Step 4 that, with this RFC, Ms. Canata cannot perform any of her prior work (R. 24). But, at Step 5, the ALJ found that Ms. Canata's RFC allows her to perform jobs that exist in substantial numbers in the national economy (R. 20-21).

## III.

Ms. Canata raises a number of challenges to the ALJ's determination, alleging errors in Steps 2 and 3, in the ALJ's assessment of her credibility in the RFC determination between Steps 3 and 4, and in the application of the RFC finding at Step 5. We address only the arguments concerning Steps 2 and 3, because the ALJ's determination at Step 3 requires remand.[5]

### A.

At Step 2 of the sequential evaluation, the ALJ found, in accordance with the pertinent regulations, 20 C.F.R. § 404.1521 *et seq.* and § 416.921 *et seq.*, that Ms. Canata had three severe impairments: spinal disorder, depression, and anxiety (R. 16). The ALJ offered a short, two-paragraph explanation for this finding. The ALJ relied on Dr. Pilapil's physical RFC assessment, which indicated severe impairment in Ms. Canata's lower back with the ability to perform light work (R. 365-72), and the ME's testimony that Ms. Canata had severe depression and anxiety (R. 16).

Ms. Canata contends that the ALJ's Step 2 finding was "incomplete" because it lacked a functional analysis (Pl.'s Br. at 8). However, as a Step 2 finding "is merely a threshold requirement," *Hackman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999), courts in this district have repeatedly denied

---

[5]Ms. Canata argues cursorily that the ALJ erred by not requiring her to obtain counsel (Pl.'s Mem. at 15). Ms. Canata's statement, unsupported by any authority, is the kind of conclusory statement that often is deemed a waiver. *See generally Shramek v. Apfel*, 226 F.3d 809, 810 (7th Cir. 2000) (failure to raise issue before Appeals Council does not result in waiver before district court; but failure to raise argument in district court results in waiver on appeal from that decision).

That said, we find on the merits that the ALJ committed no error in allowing plaintiff to proceed without counsel. In situations where a claimant appears without legal representation, it is the ALJ's threshold duty to advise and inform the claimant of: his or her right to legal counsel; the way an attorney can aid the claimant in the hearing; and the way to obtain affordable representation. *See Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). The record shows that the ALJ properly fulfilled that obligation. We recognize – as did the ALJ – that Ms. Canata expressed discomfort about proceeding *pro se* (R. 390-91). But, Ms. Canata was informed fully of her rights and decided to forge ahead without counsel rather than delay the hearing to obtain counsel (R. 391). That decision was Ms. Canata's to make; plaintiff has offered no authority – and we know of none - that requires an ALJ to make that choice for a claimant.

5

remand based on an alleged Step 2 error, so long as the ALJ proceeded to consider the claimant's alleged impairments past Step 2. *See, e.g., Cole v. Astrue*, No. 09 C 2895, 2011 WL 3468822, at *6 (N.D. Ill. Aug. 8, 2011); *Beach v. Astrue*, No. 09 C 2897, 2010 WL 3168292, at *8 (N.D. Ill. Aug. 4, 2010); *Boucek v. Astrue*, No. 08 C 5152, 2010 WL 2491362, at *5 (N.D. Ill. June 16, 2010). Here, the ALJ found plaintiff's alleged impairments were severe, and proceeded past Step 2 to evaluate plaintiff's ability to work given the totality of her impairments. Moreover, Ms. Canata does not explain how, if at all, she was prejudiced by the alleged incompleteness of the ALJ's Step 2 analysis. We find no basis for remand in the ALJ's Step 2 threshold determination of Ms. Canata's severe impairments.

**B.**

Having found severe impairments of a spine disorder, depression, and anxiety at Step 2, the ALJ next addressed Step 3, which requires an evaluation of whether the objective medical evidence in the record would support a finding that the severe impairment met or equaled in severity one of the listed impairments in 20 C.F.R. §§ 404.1525, 404.1526, 416.925 and 416.926. The ALJ found that none of Ms. Canata's severe impairments satisfied the criteria under the relevant listings (R. 17).

We recognize that in a social security appeal, the district court does not engage in *de novo* review. At the same time, the Court may not turn a blind eye to medical evidence in the record that creates an ambiguity related to and/or is inconsistent with the ALJ's factual findings. If such evidence exists, but is not discussed or explained by the ALJ, then a remand is in order. *See Ribaudo*

*v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006). We find that is the case with regard to the ALJ's Step 3 finding on Ms. Canata's physical claim of disability.[6]

With respect to Ms. Canata's severe impairment of spinal disorder, the ALJ's Step 3 analysis consisted of only one sentence. The ALJ found that Ms. Canata's spinal disorder did not meet the criteria of Listing 1.04, because "there is no objective evidence of spinal arachnoiditis, spinal stenosis, osteoarthritis or degenerative disc disease resulting in compromise of a nerve root or the spinal cord" (R. 17). We are skeptical that so terse an explanation for a Step 3 finding ever could satisfy the minimal articulation standard necessary to support an ALJ's findings. *See, e.g., Ribaudo*, 458 F.3d at 583-84. But, in any event, we find it did not do so here. In making his determination, the ALJ failed to address objective evidence of spinal stenosis, osteoarthritis, and degenerative disc disease. As we explain below, this shortcoming requires a remand.

**1.**

There is an abundance of medical evidence in the record describing Ms. Canata's back condition. Ms. Canata injured her lower back on August 18, 2004, w Ms. Canata contends that the ALJ's Step 2 finding was "incomplete" because it lacked a functional analysis (Pl.'s Br. at 8). hile helping a patient in her job as a CNA (R. 18, 166, 215, 548). She was treated at that time for lower back sprain by Dr. Jeff L. Grassle, a physician at Alexian Brothers, where Ms. Canata was employed (R. 211, 215, 218). Dr. Grassle reported that Ms. Canata injured her mid to upper back when she grabbed a patient who was falling to the floor and twisted her back in a way that caused injury. Dr. Grassle reported that Ms. Canata complained of pain in her back, which the physical examination

---

[6]By contrast, the Court finds that the ALJ's findings with respect to Ms. Canata's severe impairments of depression and anxiety are supported by the objective and uncontradicted substantial medical evidence in the record.

indicated was caused by strain of the muscles or ligaments supporting her spine (R. 218). Dr. Grassle noted a history of previous injury to her back, and recommended that Ms. Canata treat her injury with basic care (*e.g.,* rest, movement, limited bending and lifting, over-the-counter pain medications, and ice packs and/or massage).

After this injury, it is undisputed that Ms. Canata returned to work on light duty, attended physical therapy, and took pain medication (R. 252). On January 18, 2005, an MRI was taken at Alexian Brothers (R. 244). The MRI report stated that there was a "[b]ulge of the osteophyte disc complex L3-4 and L4-5 causing mild acquired spinal stenosis" with no other identified "abnormality" (*Id.*). Nevertheless, while on light duty, Ms. Canata reported that she was able to manage the pain.

On February 8, 2005, Dr. Mark N. Levin, of Barrington Orthopedic Specialists & Sports Medicine, recommended that Ms. Canata be released for regular duty (R. 237). Alexian Brothers subsequently returned her to full-time, heavy duty work (R. 221, 408). There is no dispute that after Ms. Canata returned to regular duty, her complaints of pain in her legs and back increased (R. 221, 408).

On February 16, 2005, Ms. Canata was seen by Dr. David Spencer at Lutheran General Spine Center complaining of severe back pain associated with a work-related injury (R. 221). Dr. Spencer's report notes Ms. Canata's past medical history of back pain associated with her back injury in August 2004 (*Id.*). His physical examination of Ms. Canata did not reveal any significant impairment, but he noted that the January 2005 MRI revealed some mild degenerative changes at L3-4 and L4-5 of the spine (*Id.*).

lower extremity pain "more so down the left leg than her right leg," as well as numbness and tingling in both legs and some weakness (R. 297). Dr. Koutsky found that the January 2005 MRI showed evidence of degenerative disc disease at L3-4 and L4-5 "with some collapse noted at both levels" as well as "some generalized disc protrusions" and "annular tears at both levels" (*Id.*). Dr. Koutsky's assessment was that Ms. Canata suffered from "chronic lumbar spondylosis and spondylitis with lower extremity radiculitis" (R. 298).[7]

On April 7, 2005, in a follow-up appointment, Dr. Koutsky reported that Ms. Canata was "still having a lot of chronic disabling pain in her lower back," as well as thoracic back pain stemming from her work injury (R. 291). The doctor noted that she was not able to start her physical therapy because she was awaiting approval from her insurance company (*Id.*). He further noted some lower back spasms and tenderness, with limited range of motion. Dr. Koutsky indicated that Ms. Canata was taking her medications but not working at that time.

On June 27, 2007, Dr. Syed Akbar took a second MRI of Ms. Canata's spine (R. 376). The MRI indicated "mild to moderate bilateral foramina stenosis" but "no canal stenosis" at L3-4 of the spinal cord. Dr. Akbar's other findings noted early degenerative disc disease at L3-4 and L4-5, but "[n]o acute fracture, spondylosis or spondylitis" (*Id.*). Dr. Akbar did not see any abnormal "signal" within the spinal cord, but he found a "small annular tear at L4-5" (*Id.*).

On August 17, 2005, Ms. Canata was examined by a Bureau of Disability Determination Services physician, Dr. Vinod Motiani (R. 362). Dr. Motiani's physical examination of Ms. Canata revealed the following findings related to her spine:

---

[7]Spondylosis is a form of osteoarthritis and spondylitis is a form of arthritis (joint inflammation) that is chronic and affects the spine; it causes pain and stiffness, with swelling and limited motion in the low back, middle back, neck, hips, chest wall and heels. *See http://www.WebMD.com.*

9

> Cervical Spine – lateral flexion 45 degrees, flexion 6 degrees, extension 75 degrees, rotation 80 degrees.
>
> Lumbar Spine – The patient has straightening. Significant spasm is evident, even without any palpation. When palpated, she tends to be more uncomfortable. Forward flexion is 50 degrees, extension is back to a neutral position. Lateral bending and rotatory movements are unremarkable; however, accompanied with significant spasms. Bilaterally the SLR in the active and passive mode is only about [400]; any movement beyond this is accompanied with significant discomfort. With the knees bent the hip movements seem unremarkable. . . . however, they do induce spasms in the lower back.
>
> Motor System: Power in the lower extremities is generally in the range of 4+/5 because of the spasms and pain. . . . Coordination is impaired in the lower extremities because of the pain.
>
> Gait – She can walk on tippy toes with some discomfort. Heel walking is definitely uncomfortable for the patient. Tandem gait is also unremarkable.

(R. 364).

Dr. Motiani's impression was that Ms. Canata "[d]oes seem to have significant back spasms with underlying degenerative disk disease with possibly some element of compressive neuropathy" (R. 364). Dr. Motiani noted that, while he did not have the MRI mentioned by Ms. Canata, "earlier findings do suggest[] chronic lumbar spondylosis and spondylitis" (*Id.*).

On September 2, 2005, Dr. Koutsky, in another follow-up appointment, reported Ms. Canata's complaints of "a lot of chronic disabling pain in her back and in her legs" (R. 300). Dr. Koutsky noted that "[h]er symptoms are disabling for her" (*Id.*). He further stated that physical therapy was not possible, because Ms. Canata's insurance company had not approved it (*Id.*). Dr. Koutsky reported continued lower back muscle tenderness and spasms with limited range of motion. His diagnosis was "chronic lumbar spondylosis and spondylitis" (*Id.*). Dr. Koutsky would not release her for work at that time. He referred her for a neuro-surgical evaluation (*Id.*).

On June 16, 2006, Dr. Robert Patey, the state agency medical consultant, filled out a consultative advice form indicating a primary diagnosis of spinal stenosis and a secondary diagnosis of disc bulge. He indicated that these impairments were considered non-severe (R. 329). However, in his explanation of the impairments, he further indicated that the MRI showed mild bulge of the osteophytic disc at L3-4 and L4-5 causing minimal acquired spinal stenosis (R. 330).

On August 25, 2006, Ms. Canata was seen by Dr. Howard S. An of Midwest Orthopedics at Rush Hospital (R. 331-32). Dr. An reviewed the MRI from January 2005, and he performed a physical examination. His examination found that Ms. Canata had mild para-spinal and midline lumbar tenderness (R. 332). She had full range of movement and extension, but negative straight leg raises bilaterally (*Id.*). Motor strength was 4/5 in her hip flexors secondary to back pain (*Id.*). Dr. An recommended "aggressive physical therapy" and some anti-inflammatory medications (*Id.*). Alternatively, he recommended steroid injections (*Id.*). His opinion was that she was not at maximum medical improvement and "should be held off work until she begins [a] physical therapy regimen" (*Id.*).

## 2.

At Step 3, the ALJ was required to determine whether this body of medical evidence shows that Ms. Canata's spinal disorder met or equaled the criteria in Listing 1.04, which states in relevant part:

> 1.04 *Disorders of the spine* (*e.g.,* herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex

loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C.    Lumbar spinal stenosis resulting in psuedoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic non-radicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

In his Step 3 finding, however, the ALJ stated only that there was "no objective evidence of spinal arachnoiditis, spinal stenosis, osteoarthritis or degenerative disc disease resulting in compromise of the nerve root or spinal cord" (R. 17). He did not discuss the medical evidence that led him to this finding, nor did he explain: (1) whether he found the medical evidence lacking as to the existence of spinal arachnoiditis, spinal stenosis, osteoarthritis, or degenerative disc disease; or (2) whether he found that the medical evidence shows that one or more of these conditions existed, but did not result in compromise of the nerve root or spinal cord. Having found that the evidence did not establish the threshold request for Listing 1.04, the ALJ did not consider the A, B, or C criteria of that listing.

### 3.

There are well-established legal principles that determine whether an ALJ's written decision denying social security benefits to a claimant can be affirmed by a reviewing court on appeal. One of those principles is that an ALJ "must evaluate the record fairly." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). This means that "although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the

ruling." *Id.* (citations omitted). To ignore an entire line of evidence makes it impossible for a reviewing court to determine whether the decision is based on substantial evidence. *Id.* A second, corollary principle is that an ALJ cannot engage in perfunctory analysis to support his findings at any given step in the sequential evaluation. *See, e.g., Ribaudo v. Barnhart*, 458 F.3d 580 (7th Cir. 2006). An example of a perfunctory analysis is one in which the ALJ does not evaluate any of the evidence favorable to the claimant at Step 3 that relates to the required criteria of a listed impairment. *Id.* at 583-84. In this case, the ALJ failed to discuss at all the medical evidence of spinal disorder at Step 3.

For starters, Listing 1.04 defines a spinal disorder to include "degenerative disc disease" and/or "spinal stenosis." Ms. Canata submitted medical evidence of these conditions. For example, an MRI was taken on January 18, 2005 – just prior to the alleged onset date – and showed bulging of the osteophyte disc complex L3-4 and L4-5 causing mild acquired spinal stenosis (R. 244). Subsequent reports confirmed degenerative disc disease as of February 24, 2005 (R. 297), spinal stenosis as of June 16, 2006 (R. 329), and mild to moderate bilateral formina stenosis as of June 27, 2007 (R. 376).

This evidence alone does not show that Ms. Canata met the threshold criterion of Listing 1.04, which requires not just spinal stenosis or degenerative disc disease, but also medical evidence that this condition has a certain effect: "compromise of a nerve root (including the cauda acquina) or the spinal cord." But, on this score, we note there exists medical evidence that the ALJ failed to discuss which might indicate either one of these effects. On February 24, 2005, Dr. Koutsky reported a "collapse" at both the L3-4 and L4-5 levels of the spinal cord, based on a review of the January 2005 MRI (R. 298). In a physical examination without an MRI to study, Dr. Montini, a

13

DDS examiner, reported that Ms. Canata had "underlying degenerative disc disease with possibly some element of compressive neuropathy" (R. 364), as well as possible "chronic lumbar spondylosis and spondylitis" (R. 364).

By these comments, we do not suggest that it is a foregone conclusion that Ms. Canata meets or equals Listing 1.04. We recognize that there is evidence that may weigh against such a finding. A conclusory statement that a severe impairment does not meet or equal a listing cannot substitute for a meaningful discussion of all the relevant medical evidence. *Ribaudo*, 418 F.3d at 584 (the ALJ's "failure here to evaluate any of the evidence that potentially supported Ribaudo's claim does not provide much assurance that he adequately considered Ribaudo's case"). After a sufficent review and consideration of the relevant medical evidence, the ALJ will be free to determine whether Ms. Canata's spinal disorder meets or equals Listing 1.04.[8]

In making that determination, the ALJ may wish to consider appointing a medical expert to assist him in evaluating the medical evidence concerning Ms. Canata's spinal disorder. An ALJ is not required to call a medical expert, and has discretion regarding whether the assistance of a medical expert is necessary to adjudicate a claim. *See* 20 C.F.R. § 404.1527(f)(2)(iii) (ALJ has discretion whether to call a medical expert); § 405.10(b)(2) (if an ALJ needs medical evidence not provided by a claimant to adjudicate a claim they must call a medical expert). The ALJ exercised that discretion to call a medical expert to testify regarding Ms. Canata's mental impairments, but not her physical impairments. Perhaps it is not mere coincidence that the ALJ's Step 3 analysis of Ms. Canata's mental impairments is far more extensive than is the one-sentence conclusion at Step 3

---

[8]We note that the ALJ did address much of the medical evidence in the course of his RFC finding. However, that discussion did not analyze the medical record with respect to the criteria in Listing 1.04, and thus cannot substitute for the analysis required at Step 3.

concerning her physical impairment. The ALJ should consider whether a medical expert might assist in determining whether Ms. Canata's spinal disorder medically meets or equals the requirements in Listing 1.04.

## CONCLUSION

The Court therefore directs the Clerk of the Court to enter judgment reversing and remanding this case to the Commissioner for further review, consistent with the guidance set forth in this Memorandum Opinion and Order. We therefore grant Ms. Canata's motion to reverse and remand (doc. # 34) and deny the Commissioner's request to affirm. This case is terminated.[9]

ENTER:

/s/ Sidney I. Schenkier

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: December 23, 2011**

---

[9]Because we resolve this case at the ALJ's Step 3 analysis, we do not decide Ms. Canata's other grounds asserted in support of reversal and remand. However, we do point out that the ALJ's credibility finding states only that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 18). This is a boilerplate formulation akin to the kind that the Seventh Circuit has increasingly found unsatisfactory. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010). A significant problem here is that the ALJ's conclusory credibility finding suggests that he first fashioned the RFC based on other evidence, and then simply dismissed any of Ms. Canata's statements that did not fit into that pre-determined RFC. That kind of approach offers no insight into why the evidence that led the ALJ to adopt his RFC was more credible than Ms. Canata's statements of her limitations. "Finding statements that support the RFC credible and disregarding those that do not 'turns the credibility determination process on its head.'" *Collins v. Astrue*, No. 10 C 8067, 2011 WL 6318720, *10 (N.D. Ill. Dec. 16, 2011) (*quoting Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003)).